UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

ELIZABETH A. BAILEY, and
ELIZABETH A. BAILEY, in her capacity
as the personal representative
of the Estate of ADRIAN DOUGLAS
BAILEY, JR., decedent,

                Plaintiffs,

v.                                  Civil Action No.: 2:01-1273


FORTIS BENEFITS INSURANCE COMPANY,

                Defendant.

                MEMORANDUM OPINION AND ORDER

        Pending are two motions for summary judgment, one filed

by defendant Fortis Benefits Insurance Company ("Fortis") on June

24, 2002, and the other filed by plaintiffs on July 16, 2002.[1]


                    I.  Background

        Adrian Douglas Bailey, Jr., was formerly employed as a

case worker by Shawnee Hills, Inc. ("Shawnee Hills").  (Am.

_____

        [1] In May 2002, before the pending motions were filed,
defendant Shawnee Hills petitioned for bankruptcy protection,
prompting the court to stay this action on July 19, 2002.
Following a status hearing on September 28, 2010, with the
bankruptcy petition yet pending, plaintiff Elizabeth Bailey moved
to dismiss Shawnee Hills from this case.  By order entered
October 13, 2010, the court dismissed Shawnee Hills with
prejudice, lifted the stay, and directed the remaining parties to
submit supplemental briefing in support of their respective
motions for summary judgment.

Compl. ¶ 5).  As a Shawnee Hills employee, Mr. Bailey was enrolled in two benefits programs, the Group Short Term Disability Insurance Plan (the "Short Term Plan") and the Group Term Life, Long Term Disability, and Accidental Death and Dismemberment Insurance Plan (the "Life Insurance and Long Term Plan"), both issued by defendant Fortis.  (Admin. Rec. at 1, 21) (hereinafter "AR at ").  The Short Term Plan provides short-term disability benefits for twenty-two weeks if a plan participant is prevented from performing his or her regular occupation due to injury, sickness, or pregnancy.  (AR at 8).  The Life Insurance and Long Term Plan provides, among other things, life insurance, survivor benefits, and long-term disability benefits to plan participants.  (AR at 32-33, 37).  The parties agree that each plan qualifies as an employee benefit plan under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq.

Mr. Bailey began suffering from severe depression in 1992.  (AR at 268).  On November 11, 1996, he was seen by Dr. Russ Voltin, a psychiatrist in Charleston, West Virginia.  (AR at 251-53).  Mr. Bailey reported that he suffered from anxiety, that he was a "constant worrier," and that "he felt that people at work were trying to get rid of him" because of his condition.

2

(AR at 251).  Dr. Voltin prescribed an antidepressant to Mr.
Bailey and advised him to seek psychotherapy.  (AR at 253).

        Mr. Bailey ceased working for Shawnee Hills on December
24, 1996, due to his chronic depression.  (AR at 270). On
December 30, he scheduled an "emergency appointment" with Dr.
Voltin.  (AR at 249).  According to Dr. Voltin's notes from the
visit, Mr. Bailey "took a two-week supply of [a certain
medication] one evening," prompting an "amnestic episode."
(Id.).  Mr. Bailey assured Dr. Voltin that the incident was not a
suicide attempt but could not otherwise explain the overdose.
(Id.).  Mr. Bailey stressed that he was "unable to concentrate"
and was "no longer able to deal with the stress at work."  (Id.).

        On January 9, 1997, Mr. Bailey applied for short-term
disability benefits.  (AR at 267-68).  Dr. Voltin supported Mr.
Bailey's claim for short-term benefits, noting that Mr. Bailey
suffered from "major depression," "poor energy, poor motivation,
poor sleep, hopelessness, [and] suicidal thoughts."  (AR at 268).
Dr. Voltin rated Mr. Bailey's physical and psychiatric
impairments as "Class 5" severe limitations, rendering Mr. Bailey
"incapable of minimal (sedentary) activity."  (Id.).  Based on
his observations, Dr. Voltin concluded that Mr. Bailey was
disabled from performing the material duties of his regular

occupation and that modification to his job would not enable Mr. Bailey to return to work. (Id.). Fortis approved Mr. Bailey's claim and, pursuant to the Short Term Plan's thirty-one-day waiting period, began paying short-term benefits on January 24, 1997, thirty-one days after Mr. Bailey ceased working for Shawnee Hills. (AR at 265).

Mr. Bailey's condition improved in the following months. On March 6, 1997, he was again seen by Dr. Voltin. (AR at 247). Mr. Bailey reported that he was "feeling better" and was "attempting to go back to school to pursue another career that is less stressful." (Id.). Mr. Bailey also stated that his mood and ability to concentrate had improved and that he was performing more household chores. (Id.). On March 17, 1997, Dr. Voltin completed a supplementary report for benefits on behalf of Mr. Bailey, notifying Fortis of Mr. Bailey's improvement. (AR at 261). With respect to his physical impairment, Dr. Voltin noted that Mr. Bailey was capable of "medium activity." (Id.). Dr. Voltin likewise rated Mr. Bailey's psychiatric impairment as a "Class 2" "slight impairment," meaning that Dr. Voltin considered Mr. Bailey "able to function in most stress situations and engage in only limited interpersonal relations." (Id.). Dr. Voltin concluded that Mr. Bailey was "a candidate for rehabilitation

4

services" and that "job modification [would] enable [him] to work
with impairment."  (Id.).  Despite Mr. Bailey's improvement,
however, Dr. Voltin later made clear in a March 27, 1997, phone
conversation with Fortis that he had not yet cleared Mr. Bailey
to return to work.  (AR at 255).

On May 22, 1997, Dr. Voltin completed a second
supplementary report for benefits on behalf of Mr. Bailey.  (AR
at 242).  Dr. Voltin reported that Mr. Bailey had no physical
limitations and that his psychiatric impairment continued to be a
Class 2 "slight limitation."  (Id.).  Dr. Voltin noted that Mr.
Bailey was a candidate for rehabilitation services.  (Id.).  He
further noted that a job modification would not enable Mr. Bailey
to work with his impairment, inasmuch as Mr. Bailey "doesn't like
[his] current job [and] would like [a] different line of work."
(Id.).

On June 3, 1997, Cindy Hutchinson of Fortis contacted
Dr. Voltin's office regarding Mr. Bailey's treatment.  (AR at
240).  An employee from Dr. Voltin's office advised Ms.
Hutchinson that Mr. Bailey still suffered from, among other
symptoms, mild anxiety and that he was scheduled to see Dr.
Voltin again in two months.  (Id.).  Ms. Hutchinson was further
informed that Mr. Bailey had indicated to Dr. Voltin that he

"wants to stay home [with his] children" rather than returning to work.  (Id.).

On June 6, 1997, following Dr. Voltin's May 22 report and the June 3 phone conversation between Fortis and Dr. Voltin's office, Fortis suspended Mr. Bailey's short-term benefits pending a review by its Clinical Services Department.  (AR at 239).  As part of that review, Dr. David Lund, Fortis' in-house psychiatrist, was charged with evaluating Mr. Bailey's medical records and determining whether Mr. Bailey was capable of returning to his occupation.  On June 25, 1997, Dr. Lund spoke with Dr. Voltin regarding Mr. Bailey's condition.  According to Dr. Lund's record of the telephone conversation, Dr. Voltin stated "from a medical standpoint that [Mr. Bailey] is not disabled [and] could RTW [return to work] at his previous position."  (AR at 232).  Dr. Lund described the remainder of his discussion with Dr. Voltin as follows:

> He [Dr. Voltin] stated the insured [Mr. Bailey] continues to have social issues [and] nutrition problems which are due to some chronic depression [and] a personality disorder but these would not preclude him from RTW [returning to work].  He states the claimant wants to stay at home with his kids for the summer.

(Id.).  Based on his conversation with Dr. Voltin, Dr. Lund concluded that Mr. Bailey was no longer disabled and that his reported limitations were no longer supported.  (Id.).  This

6

information was relayed to Mr. Bailey, who requested that Fortis delay its benefits decision until he could provide records from his psychologist.  (AR at 202).

That same day, June 25, 1997, Mr. Bailey underwent a psychological evaluation by Ms. Sally Sowell, M.A.  (AR at 222-25).  On a form entitled "Intake Interview," Ms. Sowell noted that, although Mr. Bailey showed signs of suffering from bipolar disorder and paranoia, he was possibly "looking for help [with] benefits" and "malingering."  (AR at 222).  Ms. Sowell further reported that Mr. Bailey was "extremely depressed" with "suicidal ideation," had trouble concentrating, appeared unable to process problems, and "blam[ed] Dr. Voltin for his prob[lems]."  (AR at 224).  According to her intake interview form, Ms. Sowell's therapy recommendations included, among other things, "possible hospitalization" and securing Mr. Bailey's prior medical records to rule out malingering.  (AR at 225).

Two days later, on June 27, 1997, Mr. Bailey was admitted to Thomas Memorial Hospital in South Charleston following an apparent suicide attempt.  (AR at 438).  While in the hospital, Mr. Bailey was seen by several doctors, including Dr. Voltin, who reported that Mr. Bailey had attempted suicide because "it was 'his only option'" after his disability benefits

7

had ended.  (Id.).  Similarly, Dr. Daniel Thistlethwaite noted
that Mr. Bailey was "focused on obtaining disability" and had
"identified Shawnee Hills . . . as his source of increased
stress."  (AR at 424).  Dr. Thistlethwaite further observed that
Mr. Bailey was advised several times to "seek employment in a
less stressful environment."  (Id.).  Mr. Bailey was discharged
from the hospital on July 1, 1997.  (AR at 425).

        Meanwhile, on June 30, 1997, five days after advising
Dr. Lund that Mr. Bailey could return to work and three days
after Mr. Bailey's suicide attempt, Dr. Voltin sent Fortis a note
stating that "[a]t this time [Mr. Bailey] is not able to return
to his previous employment."  (AR at 228).  Dr. Voltin instead
recommended that Mr. Bailey "begin vocational rehabilitation to
facilitate his return to gainful employment."  (Id.).  Dr. Voltin
did not provide a basis for this determination, nor did he
explain why it differed from his earlier conclusion that Mr.
Bailey was no longer disabled.

        On July 2 and 10, 1997, Mr. Bailey was seen by Ms.
Sowell, his psychologist.  (AR at 208, 220).  Mr. Bailey
explained that he remained depressed, that he worried about what
others thought of him, and that he suffered from "general
anxiety."  (AR at 220).  Mr. Bailey also complained of financial

8

problems and reported that he "[w]ould like to do something outdoors."  (AR at 208).  According to Ms. Sowell's progress notes, Mr. Bailey asserted that he was "looking for simple" work and "wants to be [a] homemaker."  (Id.).  Ms. Sowell recommended that Mr. Bailey find less-stressful work.

On July 24, 1997, Dr. Lund and Ms. Sowell spoke regarding Mr. Bailey's treatment.  (AR at 205).  According to Dr. Lund's record of the phone conversation, Ms. Sowell still questioned whether Mr. Bailey was "malingering."  (Id.).  Dr. Lund also noted that, according to Ms. Sowell, Mr. Bailey "does not want to return to SW [social work]" and "is not motivated to RTW [return to work]."  (Id.).  Based on her visits with him, Ms. Sowell concluded that Mr. Bailey could not return to work as a case manager, though she admitted to Dr. Lund that she had not discussed this matter with Dr. Voltin.  (Id.).

On July 30, 1997, Dr. Lund had a similar conversation with Dr. Voltin regarding Mr. Bailey's ability to return to work. (AR at 204).  Dr. Lund asked Dr. Voltin whether Mr. Bailey could return to work as a social worker for a different employer, and Dr. Voltin agreed that Mr. Bailey could return to work under that scenario.  (Id.).  Dr. Lund also pointed out the inconsistency between Dr. Voltin's June 25 assertion that Mr. Bailey could

return to work and his June 30 note advising that Mr. Bailey
should refrain from working.  (Id.).  Dr. Voltin responded that
he believed Mr. Bailey "cannot return to his employer [Shawnee
Hills] but could work elsewhere."  (Id.).  Based on his
conversation with Dr. Voltin, Dr. Lund concluded that Mr. Bailey
was not disabled from his own occupation.  (Id.).

On August 4, 1997, Fortis completed its review of Mr.
Bailey's claim for benefits, concluding that, as of May 22, 1997,
Mr. Bailey was no longer disabled.  Fortis acknowledged that Mr.
Bailey had problems with his former employer, Shawnee Hills,
thereby precluding him from performing his job.  (AR at 200).
Nevertheless, relying on Dr. Lund's recommendation, as well as
Dr. Lund's phone conversations with Dr. Voltin and Ms. Sowell,
Fortis concluded that Mr. Bailey was not disabled inasmuch as he
was not limited from performing his occupation, albeit for a
different employer.  (Id.).  Fortis emphasized the Short Term
Plan's definition of disabled, which provided that "[d]isabled
and disability mean that injury, sickness, or pregnancy, prevents
you from performing your regular occupation and requires you to
be under the regular care and attendance of a doctor."  (Id.).
Accordingly, Fortis permanently terminated Mr. Bailey's
disability claim.

10

On September 17, 1997, Mr. Bailey's wife, plaintiff
Elizabeth Bailey, submitted a complaint to the West Virginia
Office of the Insurance Commissioner regarding Fortis's decision.
(AR at 198).  In her complaint, Mrs. Bailey contended that Dr.
Voltin had never informed Mr. Bailey that he could return to
work.  (Id.).  Mrs. Bailey also stressed that her husband's
condition had not changed and that he had "sought the services of
Dr. Sidney Lerfald who diagnosed [Mr. Bailey] with . . . bipolar
disorder [and] began Lithium therapy."  (Id.).  Mrs. Bailey's
complaint was thereafter forwarded to Fortis.  Deeming the
complaint to be a formal appeal of its decision to deny benefits,
Fortis invited the Baileys to provide medical records and other
information from Dr. Lerfald and any other physician Mr. Bailey
had seen.  (AR at 188-89).

Consistent with Fortis's request, on November 12, 1997,
Dr. Lerfald, a psychiatrist in Charleston, submitted a letter
regarding Mr. Bailey's treatment.  (AR at 182).  Dr. Lerfald
noted that Mr. Bailey had been under his care since August 14,
1997, "for Rapid Cycling Bipolar Mood Disorder."  (Id.).  Dr.
Lerfald also observed that Mr. Bailey "is currently unable to
return to work and further medication changes are being
instituted."  (Id.).  Dr. Lerfald estimated that, if the

11

medication changes proved successful, Mr. Bailey could return to work in three to six months.  (Id.).

        In December 1997, Dr. Lerfald submitted Mr. Bailey's medical records to Fortis.  Those records indicated that Mr. Bailey was seen by Dr. Lerfald on several occasions in 1997, including August 14 and 28; September 8 and 15; October 13, 20, and 30; November 12 and 19; and December 10 and 17.  (AR at 151-75).  Like Dr. Sowell, Dr. Lerfald questioned Mr. Bailey's motivation for seeking therapy.  For example, during his initial visit with Mr. Bailey on August 14, 1997, Dr. Lerfald noted that Mr. Bailey "resents Dr. Voltin for loss [of] temporary benefits" and "volunteered [that] he was seeking disability."  (AR at 175).  Nevertheless, Dr. Lerfald concluded that Mr. Bailey was incapable of returning to work, inasmuch as he suffered from many conditions associated with bipolar disorder, including depression, anxiety, sleep deprivation, aggressiveness, poor appetite, and bouts of amnesia.  (AR at 151-75).  By letter dated February 23, 1998, Dr. Lerfald reiterated to Fortis his conclusion that Mr. Bailey was unable to return to work.  (AR at 141-42).

        On March 12, 1998, Fortis completed its review of Mr. Bailey's appeal, upholding its prior denial of benefits.  (AR at

12

137-38).  Fortis noted that its decision to deny benefits was supported by Dr. Voltin's May 22, 1997, report on Mr. Bailey's improvement and his subsequent phone conversation with Dr. Lund on June 25, 1997.  (AR at 137).  Fortis also asserted that the records received from Ms. Sowell and Dr. Lerfald, both of whom questioned Mr. Bailey's motivation for seeking treatment, supported its decision.  (Id.).  Fortis acknowledged that "Dr. Lerfald's opinion regarding [Mr. Bailey's] ability to perform [his] own occupation would seemed to have changed in the later months of 1997," but emphasized that Mr. Bailey was, by that time, "a number of months past the point when [he was] originally released to return to work."  (Id.).  Inasmuch as Mr. Bailey had not returned to work after being cleared to do so in May 1997, he was, according to Fortis, no longer a member of an eligible class under the Short Term Plan.  (AR at 137-38).  Fortis thus disregarded the fact that Mr. Bailey's condition had apparently worsened, relied on its earlier conclusion that, as of May 1997, Mr. Bailey was capable of working, and denied his appeal.

In September 1998, Mr. Bailey was awarded Social Security disability benefits.  (AR at 108).  The administrative law judge found that, since November 11, 1996, Mr. Bailey had suffered from, among other things, "bipolar disorder manifested

primarily by depression," which made impossible "minimal interaction with the public, co-workers, or supervisors, completing tasks in a timely manner, or performing tasks requiring production rates, levels or quotas producing more than low levels of stress and frustration."  (AR at 106-07).

The award of Social Security benefits prompted Mrs. Bailey on October 27, 1998, to submit another complaint to the West Virginia Office of the Insurance Commissioner regarding Fortis's benefits decision.  (AR at 97).  By letter dated November 9, 1998, Fortis acknowledged the complaint and deemed it to be a second appeal of the decision to deny benefits.  (AR at 92-93).  Fortis noted that, inasmuch as its definition of "disability" does not necessarily correlate with definitions used by other organizations, it could not give conclusive effect to the determination made by the Social Security Administration regarding Mr. Bailey's disability.  (AR at 92).  Fortis invited Mrs. Bailey to submit additional documentation demonstrating Mr. Bailey's disability, but stressed that such evidence should relate to his ability to work between March and May of 1997, rather than his ability to work as of November 1998.  (AR at 93).

The Baileys apparently provided no additional evidence, and Fortis submitted Mr. Bailey's appeal to another in-house physician, Dr. Bischoff, for review.  (AR at 276-77).  Dr. Bischoff reviewed the medical records and concluded that, between March and May 1997, Mr. Bailey "could have performed his occupation."  (AR at 277).  Accordingly, on June 17, 1999, Fortis upheld its decision to deny benefits, explaining its conclusion as follows:

> Our records indicated that Mr. Bailey was capable of returning to work at his regular occupation as early as May 22, 1997.  It was felt not to be in his best interest to return to work with his former employer. However, please note in evaluating his eligibility for benefits, we must evaluate his inability to perform his regular or own occupation as it is performed in a typical work setting for any employer in his local economy.  He resided in a metropolitan area for which it is reasonable to conclude that he had other employment opportunities as a Social Worker Case Manager.  While it appears his condition may have deteriorated at a later date, we cannot alter the fact that Mr. Bailey's attending physician [Dr. Voltin] released him to return to work at his own occupation with another employer in May 1997.  As such, he ceases to be a member of the eligible class of insured persons.

(AR at 271-72).

On April 17, 1999, while his appeal with Fortis was pending, Mr. Bailey died from a condition unrelated to the one for which he was seeking disability benefits.  (AR at 279).  In September 2001, Mrs. Bailey, acting in her individual capacity

15

and as the personal representative of Mr. Bailey's estate,
initiated this ERISA suit in the Circuit Court of Kanawha
County.[2]  (State Court Docket Sheet, attached as Ex. A to Notice
of Removal).  With respect to the Short Term Plan, Mrs. Bailey
alleges that short-term disability benefits were due to Mr.
Bailey inasmuch as he was never cleared to return to work by Dr.
Voltin.  (Am. Compl. ¶ 3).  As to the Life Insurance and Long
Term Plan, the amended complaint states (1) that Mr. Bailey,
prior to his death, applied for long-term disability benefits but
was told by Fortis that such benefits were unavailable until a
decision was reached on his appeal for short-term disability
benefits, and (2) that Mrs. Bailey applied for life insurance
benefits shortly after her husband's death.  (Am. Compl. ¶¶ 12,
22).  Mrs. Bailey seeks a declaration that she and her husband's
estate are entitled to an award of short-term disability
benefits, long-term disability benefits, and life insurance
benefits.  (Id. ¶ 30).

     On December 1, 2001, defendants Fortis and Shawnee
Hills removed.  As mentioned, defendant Shawnee Hills was
dismissed from this action by order entered October 13, 2010.

_____

     [2]Mrs. Bailey is pursuing this action in her individual
capacity inasmuch as she was the named beneficiary under the Life
Insurance Plan.

16

## II.  Standard of Review

The standard of review for a decision made by an administrator of an ERISA benefit plan generally is de novo. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Bynum v. Cigna Healthcare of N.C., Inc., 287 F.3d 305, 311 (4th Cir. 2002).  Where the plan gives the administrator discretion to determine benefit eligibility or to construe plan terms, however, the standard of review is whether the administrator abused its discretion.  Firestone, 489 U.S. at 111; Stup v. Unum Life Ins. Co. of Am., 390 F.3d 301, 307 (4th Cir. 2004).

Our court of appeals has held that an ERISA plan can confer discretion on its administrator in two ways: "(1) by language which 'expressly creates discretionary authority,' and (2) by terms which 'create discretion by implication.'"  Woods v. Prudential Ins. Co. of Am., 528 F.3d 320, 322 (4th Cir. 2008) (quoting Feder v. Paul Revere Life Ins. Co., 228 F.3d 518, 522-23 (4th Cir. 2000)).  Whether discretion is created expressly or implicitly, "the plan must manifest a clear intent to confer such discretion" for the abuse of discretion standard to apply.  Id. For example, in Woods, the Fourth Circuit held that "discretionary authority is not conferred by the mere fact that a

17

plan requires a determination of eligibility or entitlement by
the administrator." Id. As a result, where the benefits plan
merely assigns authority with the administrator to make benefit
designations, de novo review is appropriate. Id. at 324.

Both the Short Term Plan and the Life Insurance and
Long Term Plan assign authority with Fortis to determine a
participant's entitlement to benefits. (AR at 15, 37). The
Short Term Plan, for instance, provides that the claimant "must
furnish whatever items we [Fortis] decide are necessary as proof
of loss or to decide our liability." (AR at 15). Neither plan,
however, confers discretionary authority on Fortis in making its
benefits determination. Inasmuch as the plans merely assign
authority with Fortis to determine eligibility, the court finds
and the parties agree that, under Woods, the appropriate standard
of review is the de novo standard of review.

### III.  Analysis

A.  Short-Term Disability Benefits

The Short Term Plan provides in pertinent part as
follows:

> Disabled and disability mean that injury, sickness, or
> pregnancy prevents you [the claimant] from performing

18

        your regular occupation and requires you to be under
        regular care and attendance of a doctor.

(AR at 8).  The parties agree that Mr. Bailey's regular

occupation was a "case manager."  Accordingly, it was plaintiffs'

burden to "submit objectively satisfactory proof" that he was

unable to perform his occupation as case manager between January

24, 1997, when his short-term disability benefits began, and June

27, 1997, when the twenty-two week benefit period concluded.  See

Gallagher v. Reliance Standard Life Ins. Co., 305 F.3d 264, 270

(4th Cir. 2002) (observing that the burden of proving disability

is on the employee).

        In an effort to satisfy this burden, plaintiffs

emphasize the opinions of Ms. Sowell and Dr. Lerfald, both of

which, plaintiffs maintain, demonstrate that Mr. Bailey was

incapable of returning to his occupation as case manager.  (Pls.'

Supp. Mem. at 19-22).  Specifically, plaintiffs stress that on

July 24, 1997, Ms. Sowell advised Dr. Lund that, in her opinion,

Mr. Bailey was incapable of returning to work.  (AR at 205).

Similarly, plaintiffs maintain that Fortis "refused to consider

any opinion of Dr. Lerfald," which "clearly indicate[d] that Doug

Bailey had significant limitations due to his mental condition

and was unable to perform the duties of" his occupation.  (Pls.'

Supp. Mem. at 22).  Plaintiffs suggest that these medical

                              19

opinions sufficiently demonstrate Mr. Bailey's inability to work, rendering Fortis' benefits decision inappropriate.[3]

At most, the opinions of Dr. Lerfald and Ms. Sowell demonstrate that Mr. Bailey's condition worsened in the latter half of 1997.  Indeed, Mr. Bailey sought their opinions only after he had grown frustrated with his previous treating physician, Dr. Voltin, whom Mr. Bailey "resent[ed] . . . for loss [of his] temporary benefits" and "blam[ed] . . . for his prob[lems]."  (AR at 175, 224).  By contrast, there is considerable evidence in the record suggesting that Mr. Bailey was fit to return to work as early as May 22, 1997, including the following:

- Dr. Voltin's May 22, 1997, report on behalf of Mr. Bailey, wherein Dr. Voltin rated Mr. Bailey's psychiatric condition as only a "slight limitation" and noted that Mr. Bailey "doesn't like [his] current job

---

[3] Plaintiffs also rely on the Social Security Administration's ("SSA") finding that Mr. Bailey had been disabled since November 11, 1996.  The Fourth Circuit has observed that "consideration . . . of the SSA's finding should depend, in part, on the presentation of some evidence that the 'disability' definitions of the agency and Plan are similar." Elliot v. Sara Lee Corp., 190 F.3d 601, 607 (4th Cir. 1999). Plaintiffs have not attempted to show that Fortis employed a similar definition of "disability" as did the SSA in making its benefits decision.  Indeed, the SSA considered some factors, such as the prevalence of the claimant's occupation in the national economy, that are inapplicable under the Short Term Plan.  (AR at 107).  Accordingly, the SSA determination provides no basis for concluding that Mr. Bailey was disabled under the Plan.

[and] would like [a] different line of work."   (AR at 242).

- The June 3, 1997, phone conversation between employees of Fortis and Dr. Voltin's office, during which Fortis was advised that Mr. Bailey "wants to stay home [with his] children" rather than return to work.  (AR at 240).

- The June 25, 1997, phone conversation between Drs. Lund and Voltin, during which Dr. Voltin asserted that Mr. Bailey "is not disabled [and] could [return to work] at his previous position."   (AR at 232).

- Ms. Sowell's concern on June 25, 1997, that Mr. Bailey was simply "looking for help [with] benefits" and "malingering."  (AR at 222).

- Mr. Bailey's assertion to Ms. Sowell that he "[w]ould like to do something outdoors" or "be [a] homemaker." (AR at 208).

- The July 24, 1997, phone conversation between Dr. Lund and Ms. Sowell, during which Ms. Sowell asserted that she still questioned whether Mr. Bailey was "malingering" and that he "is not motivated to [return to work]."   (AR at 205).

- The July 30, 1997, phone conversation between Drs. Lund and Voltin, during which Dr. Voltin again asserted that Mr. Bailey was fit to return to work.  (AR at 204).

The above evidence suggests that Mr. Bailey's failure to return to work, whether with Shawnee Hills or another employer, was merely a personal choice based on his dissatisfaction with his occupation.  On more than one occasion, Mr. Bailey indicated that he would prefer a different line of work, and several of his physicians observed that Mr. Bailey

21

might be seeking treatment simply in an effort to avoid returning to work.

Put simply, plaintiffs are unable to identify any evidence demonstrating that Mr. Bailey remained disabled as of May 22, 1997.  Accordingly, after reviewing de novo the evidence contained in the administrative record, the court concludes that plaintiffs have failed to satisfy their burden of providing objectively satisfactory proof that Mr. Bailey was unable to perform his occupation as case manager from January 24 to June 27, 1997.  Fortis thus did not err in terminating his claim for short-term benefits.

B.   Long-Term Disability and Life Insurance Benefits

As relevant to this case, the Life Insurance and Long Term Plan provides two types of benefits to covered individuals. First, the Plan provides that, upon receipt of "written proof of [the covered individual's] death . . . and a completed claim form," Fortis will pay life insurance benefits to the identified beneficiary.  (AR at 32, 37).  Second, the Plan provides a long-term disability benefit to individuals who, because of injury or physical or mental disease, are prevented from doing any job for which they are qualified based on education, training, or

22

experience.  (AR at 28, 37).  To be eligible for life insurance and long-term disability benefits under the Plan, an individual must be an "active, full-time employee of [Shawnee Hills]."  (AR at 32).  Alternatively, benefits continue for individuals who, due to disability, are unable to work full time for at least six months.  (AR at 37).  The plan defines "disability" as "injury or physical or mental disease [that] prevents you [the claimant] from doing any job for which your education, training, or experience qualifies you."  (AR at 28).

Fortis contends that the Baileys are entitled to neither long-term disability nor life insurance benefits. Specifically, Fortis asserts that the Baileys did not file a claim for such benefits, as required by the Life Insurance and Long Term Plan.  Fortis thus maintains that the Baileys failed to fully exhaust their administrative remedies, necessitating dismissal of their claims for long-term disability and life insurance benefits.

It is well settled that an ERISA participant "must both pursue and exhaust plan remedies before gaining access to the federal courts."  Gayle v. United Parcel Serv., Inc., 401 F.3d 222, 226 (4th Cir. 2005).  "This exhaustion requirement rests upon [ERISA's] text and structure as well as the strong federal

interest encouraging private resolution of ERISA disputes."
Makar v. Health Care Corp., 872 F.2d 80, 82 (4th Cir. 1989).  As
a result, if a claimant has failed to avail himself of plan
remedies before resorting to federal court, and it is clear that
the opportunity to pursue remedies under the plan has passed, a
district court must dismiss the claimant's suit with prejudice.
Gayle, 401 F.3d at 230.  Alternatively, if the claimant has
failed to exhaust administrative remedies that are yet available,
dismissal without prejudice is appropriate.  Hickey v. Digital
Equipment Corp., 43 F.3d 941, 945 (4th Cir. 1995); Makar, 872
F.2d at 83.

     In an effort to demonstrate exhaustion of
administrative remedies, Mrs. Bailey has submitted her own
affidavit, wherein she attests that she applied for both long-
term disability and life insurance benefits.  (Aff. of Elizabeth
Bailey, attached as Ex. G to Pls.' Mem. in Supp. of Mot. for
Summ. J.).  Specifically, Mrs. Bailey asserts in her affidavit
that (1) she called Fortis in July 1997 and verbally applied for
long-term disability benefits, and (2) she contacted Fortis in
April 1999 following her husband's death and verbally applied for
life insurance benefits.  (Id. ¶¶ 11, 17).  She further states
that at no point during these conversations was she advised that

24

her application for such benefits needed to be in writing.
(Id.).  Accordingly, Mrs. Bailey now contends that she adequately
exhausted all administrative remedies.  Alternatively, she
requests that the case be remanded "to the plan administrator for
a full and fair review of the Estate's entitlement" to benefits
under the Life Insurance and Long Term Plan.  (Pls.' Supp. Reply
at 3).

        Mrs. Bailey's affidavit is problematic in two respects.
To begin with, the affidavit is not part of the administrative
record, and she has offered no justification for considering
evidence beyond that which was available to Fortis in rendering
its benefits decision.  See Quesinberry v. Life Ins. Co. N. Am.,
987 F.2d 1017, 1025 (4th Cir. 1993) (noting that district courts
should allow evidence beyond what was presented to administrator
"only when circumstances clearly establish that additional
evidence is necessary to conduct an adequate de novo review of
the benefit decision").  More importantly, the assertions
included in the affidavit, even if accepted as true, do not
sufficiently demonstrate that Mrs. Bailey properly applied for
long-term disability or life insurance benefits, as required by
the Life Insurance and Long Term Plan.  For example, with respect
to life insurance benefits, the Plan provides that Fortis

> will pay your [the claimant's] beneficiary the amount
> of insurance shown in the Schedule when we receive
> written proof of your death, acceptable to us, and a
> completed claim form.

(AR at 37).  Mrs. Bailey faxed a copy of her husband's death

certificate to Fortis on or around May 17, 1999, thereby

satisfying the "written proof of death" requirement.  (AR at 279-

81).  However, there is no "completed claim form" in the

administrative record, and Mrs. Bailey does not otherwise suggest

that she completed such a form.  The Life Insurance and Long Term

Plan imposes similar obligations on claimants seeking long-term

disability benefits, and the administrative record is void of any

indication that either Mr. or Mrs. Bailey complied with these

requirements.  (AR at 37 (providing, inter alia, that claimant

must file proof of disability and submit to examination by doctor

of Fortis's choosing)).

        As a result, there is no factual record to assist the

court in reviewing plaintiffs' claim for life insurance and long-

term disability benefits.  Indeed, inasmuch as Fortis did not

have the opportunity to define the relevant issues or to apply

the relevant plan provisions, the court is left only to guess at

whether Mrs. Bailey is deserving of such benefits.  Accordingly,

the court concludes that the Baileys failed to exhaust their

administrative remedies.  Inasmuch as it is not "clear" that the

opportunity to pursue such remedies under the Life Insurance and Long Term Plan has expired, the court further concludes that dismissal without prejudice is appropriate.[4]  Gayle, 401 F.3d at 230.

IV.

Pursuant to the foregoing analysis, it is ORDERED as follows:

1.  That plaintiffs' motion for summary judgment be, and it hereby is, denied;

2.  That Fortis's motion for summary judgment be, and it hereby is, granted; and

3.  That this case be, and it hereby is, dismissed and stricken from the docket of the court.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record and any unrepresented parties.

DATED: February 2, 2011

John T. Copenhaver, Jr.
United States District Judge

---

[4] Inasmuch as the Short Term Plan and the Life Insurance and Long Term Plan define "disability" differently, the court's conclusion that Mr. Bailey was not disabled under the Short Term Plan does not preclude a finding that Mr. Bailey was disabled under the Life Insurance and Long Term Plan.

27